Well, hold on a second. Sorry. Delaney, are we okay with the recording? Yes, we are good to go. Thank you, Chief. Great. Thank you. Our second case is 25-1318, Ruffin v. Davis. Now you may go, Mr. Nichols. Thank you very much, Mr. Chief Judge. I may please the court. Good morning. My name is John Nichols. I'm here with Mary Bethay. We represent Officer Kevin Davis in this case. I know you're familiar with the records and the briefs. This case requires you to once again tackle the difficult issue of qualified immunity for a police officer in a police-involved shooting. The district court had three undisputed facts that she found in her order. Number one, he possessed a firearm. Number two, he ignored Officer Davis's repeated commands to stop running, get on the ground, and show his hands. And number three, J.R. turned to face Davis in the final moments of the chase as shown by the impact of Davis's rounds. I would add to that that it is not disputed in this case that at the time of this incident, Governor McMaster had issued a curfew order, which Officer Davis was aware of. That's undisputed in this case. It's also undisputed that at the time of the pursuit, between the time he crouched down to retrieve his weapon that he had, we don't know whether he dropped it or he was getting it from his ankle. We don't know why. That is in dispute. But what is not in dispute is that he crouched down at the entryway to the parking lot, retrieved his weapon in his right hand, and then he looked at Davis, you can see it on the video, and then took off running again. Now, he wasn't running. Right, and that's when he fired the first and that's when Davis fired the first shot and missed. And perhaps then there was a threat, but you were about to say that then he took off running. And it was after he started running away that the officers shot and killed him. What threat was there then? Well, Judge Thacker, he ran away, but then he's not running away. He's running perpendicular. He's on the... Because there's a fence, because he can't get beyond the fence. Well, he was at the building. Yes, ma'am. He was at the building. He's running perpendicular, and Officer Davis is, you can see it on the Eau Claire, it's not entirely clear, but you can see it on the Eau Claire video. Officer Davis is standing at the entry to the parking lot, and he's running perpendicular to Officer Davis. And he looked at Officer Davis. The district court did, as you note, find the three points of fact that you outlined, but the district court also found several factual questions that were in dispute, including whether J.R. actually pointed the gun, whether he was turned toward the appellant to gain a sight, or whether he merely turned his head, as well as the number of shots that were fired, which seemed to be inconsistent. The video is inconsistent with what appellant says. So it's, are we going to believe our own eyes or what appellant says, I guess. But my point is, there are factual disputes that the district court found, so how is that, when there are factual disputes that the district court found, how is that appropriate for qualified immunity at this point? Well, Judge Sacker, I would submit that they must be factual disputes of material facts, and those facts are not material to what the region... Whether he was pointing the gun at the officer would be material to whether the officer would have reasonably felt threatened, would it not? Well, this court's jurisprudence and jurisprudence from other jurisdictions has held that an officer need not wait until the suspect point a gun or discharge around. But the question is whether he was pointing the gun or not. And the jurisprudence also says very clearly, including Supreme Court jurisprudence, that you can't exercise deadly force when someone is running away. Well, and I would submit that he was running away, but he was also running perpendicular and looked at Officer Davis with the handgun in his hand at the time. Yeah, go ahead. No, go ahead, Judge Sacker. So, Mr. Nichols, so right there is sort of, I think that the key issue is you say, I think you're right, that an officer need not wait until a weapon is pointed at him or her before employing deadly force. But what's the case that says that an officer can shoot somebody simply because someone has turned his head without pointing a weapon? Well, and Judge Diaz, I appreciate the question, but that's not what we have here. It wasn't simply because he turned his head. He is disobeying. That's the question of fact that the district court found. The district court found that there's a question of fact as to what Chief Judge Diaz just laid out, whether he turned his head and whether he was pointing the gun. Respectfully, Judge Sacker, that was one of the facts that Judge Leiden found was not in dispute, that he did turn to face Officer Davis. At the time he shot him and missed him. I'm talking about when he shot him four times and killed him. But the round... That's the point we need to focus on, when he killed him, not when he missed. Well, the record reveals that the round hit him in the forehead. It is physically impossible... Right, but Chief Judge... Okay, I'm sorry. Go ahead. It's our condition. It's physically impossible for him to be facing the other direction, running away for the round to hit him in the forehead. That was the only round that hit him. Clearly that may be the case, but the question is, if he turned his head and was shot then, and there's a dispute as to whether or not the gun was pointed at the officer, so... Actually, Judge Diaz, we have to accept that the gun was not pointed at the officer. Not pointed, okay. So tell me what are the other facts that suggest that that use of force in that context? Well, I have to point out a couple of things. Number one, this entire encounter took 42 seconds, and from the point of the first shot to about the last shot, by my count, was about 10 seconds. So everything is happening, and what the district court did, what I submit the appellee did, and what this court is on the precipice of doing, is to do 20-20 hindsight as to what happened here. It's just natural for human beings to want to fill in the gaps and put an entire picture and look at facts that are really not relevant to what a reasonable officer observed at the time of the shooting. So those facts are, he has been told... What kind of facts are not relevant? One of the questions of fact that the district court found is whether J.R. was looking at the officer in order to gain a sight when the officer shot him, or merely turned his head. Well, Judge Sackler, what she actually... The officer doesn't get to shoot him, does he? What she actually said is he turned to face Davis in the final moments of the trial. He was looking at the officer in order to gain a sight, or merely turn his head. That's what the district court found was one of the things the district court found was a question of fact, I thought. Well, we don't know why he turned to face Davis. That's the point! That's the point! That's the point! We don't know, and if he merely turned his head, you're surely not arguing that the officer gets to shoot him for merely turning his head, are you? Well, at that point in time, he is in the public, he is possessing a handgun. So you're saying, yes, he's possessing a handgun. I am saying not just because... You can't possess a handgun in South Carolina? I'm sorry, I spoke over you, Judge Sackler, I apologize. What was your question? I don't know. You asked if it's legal to possess a... I think you are actually saying that... I think you're actually... My question was, I said, surely you are not saying that the officer could shoot and kill him for merely turning his head, are you? No, ma'am. It sounded like you're about to say yes. Oh, I'm sorry, I misunderstood your question. If the only fact is that he turned to face the officer, no ma'am, I am not saying that gave the officer the right to use deadly force. But that's not the facts that we have here. We have Officer Davis attempting to encounter J.R. who takes off running. He's told seven times, stop, get on the ground. What was his crime? What was his crime that he was being chased for initially? Well, at that time, Officer Davis was on the scene because they had received information about property crimes. Right, property crimes. I thought it was riding a bike and looking in car windows. Was there something about breaking into the cars? Was it just riding bikes and looking in car windows? But that was against the backdrop of Mr. Gunnels telling them that he was familiar with the fact that there had been prior property crimes involving people. Prior, but he was not out there for property crimes. He was out there for teenagers riding bikes and looking in car windows. Correct. Probably the curfew you were talking about earlier. And part of the curfew, which again. So he chased him initially for that. He's pursuing him initially for riding bikes and looking in car windows. Well, you know, J.R. did not have a bicycle. Right. That was going to be my next question. He didn't even have a bike. So I'm not sure why he was chasing him in the first place. But we all know that after the fact, Judge Thacker. We don't know. No, the officer knew it. That's why he was on the scene. He was on the scene because he was looking for teenagers that were riding bikes and looking in car windows. And then he comes on J.R. who doesn't even have a bike and he starts chasing him. And now I'll give you after the fact, after he's chasing him, J.R. did have a gun. I just was curious why he chased him in the first place and he ended up dead. Well, what he's got is he sees someone walking. He doesn't know if he's ditched a bike or whatever, but he sees someone walking at that time. That's the curfew. The curfew is in place. We don't know that he whether he's now we've got a lot of information after the fact that he may have left his job, cashed his check, was carrying one hundred and forty four dollars and needed the guns for protection, even though he's a minor. We know a lot of facts. We Monday morning. We know a lot of things. But that's not what Officer Davis saw at the time and what this court has to decide. And what do you think is your most the most analogous case to what to what we're dealing with here? Well, I think this court's recent cases. I mean, in Benton, Benton laid out exactly a pretty good survey of the cases, but there isn't there. There isn't exactly a case on point with these facts now. But you think Ben is the best? You think Ben is the best or just the Ben lays out other cases? I rely on them a lot because Benton does a pretty good survey of of this court's cases and cases around the country. But certainly. And you just don't think there are any disputed issues of fact, which is what the district court found? Oh, Judge Sacker, I can see that there are issues of fact. Well, my argument is that they're not material to the to the question that the three facts that the district court found when you add in the fact of government. I think that goes back to Chief Judge Diaz's question about the disputed facts. You don't think that it's material as to whether or not J.R. was pointing the gun or merely turning his head. I think if all you had was J.R. turning his head, you had no other facts. If all you had was J.R. turning his head, I agree with you that deadly force is not warranted in that case. And I don't believe any court would find deadly force was warranted there. But that's not what we have. We have he possessed a firearm. We had he ignored repeated commands to stop, get on the ground and show his hand. Did he make the commands right before he shot him four times or were the commands before he shot him and missed him once? There were several commands before he fired. So there were commands right before he shot him in the head? Yes, ma'am. It's on the video. It's on the body cam video. Right before. They were before and then once he saw him crouch down and retrieve the weapon. I can watch the video too. Yes, ma'am. I've watched the video several a number of times, quite frankly, and it's a difficult video to watch, as is all these cases. I mean, this is a tragedy. But this was a tragedy that came on because he didn't obey the police officer when the police officer asked him to stop, get on the ground and show his hands. And he took off running and then after he chased him for no reason. But OK, well, if he. Well, Mr. Nichols, I'm sorry to interrupt you. I just want to try to focus your attention again on what exactly the officer perceived to be the danger that required the use of his weapon at the point where the young man turned his head, because you've agreed that that by itself would not be enough to warrant the use of deadly force. And you were getting through the sequence of events that you say painted a fuller picture. But don't our cases then also say, in addition to all the things that appear on the record that would appear to favor the officer's use of force, there has to be some kind of furtive gesture or movement or use of the weapon in a way that suggests that the officer is in danger. So what is the furtive movement or gesture in this case? We contend that when he stopped, crouched down, grabbed the gun, looked at Officer Davis and took off. And while he's running perpendicular to Officer Davis, looked his way. That was the movement. So it sounds like the turn of the head is the furtive gesture. While he possesses the handgun in his right hand, Judge Diaz, he. OK, I mean, if that's your position, that's fine. But well, I'm not sure that the case I think there's probably a dispute there as to whether or not a turn of the head is a furtive gesture. Well, that's that's going to be a question of law that you all have to decide. You have to decide that. All right. I mean, whether whether whether there was objective reasonableness in what Judge, excuse me, Officer Davis did is a matter for you all. It's not OK. So just to be clear, that's the that's the furtive gesture that you say warrants the use of deadly force in this case. That and the fact that as he's running perpendicular, he he turns and he's got the handgun in his hand. But that's always going to be the case involving a weapon. Right. So it can't be that it's got to be. Well, that's right. I'm sorry. I'm sorry. Is that right? That's right. The mere possession of a handgun isn't enough. That's that's exactly right. But again, if that's the only fact we've got, then perhaps he didn't. I mean, I think the jurisprudence says if that's the only fact he possessed a handgun, that's not enough. But that's not what we have here. And that's not what Judge Lyden found. All right. You're a little bit over, but I'll let my colleagues have any other questions. Judge Berner, Judge Thacker, you've got some time for rebuttal. All right. Yes. Thank you. Thank you, Judge. And, you know, we would ask that you reverse and I'll come back and rebuttal. Thank you very much. Thank you. All right. Ms. Schnoor. Thank you, Your Honor. May it please the court. Mary Schnoor on behalf of Plaintiff Appellee Brittany Ruffin. In this interlocutory posture, the court's jurisdiction is limited to a single narrow question. Taking the facts as the district court gave them viewed in the light most favorable to the plaintiff. Is Officer Davis still entitled to qualified immunity? Those facts are that at the time Officer Davis shot J.R., J.R. was running away from Davis at least 90 feet away from him. J.R. held a gun in his hand but had not raised it or otherwise made a movement with it. And J.R. merely turned his head to look behind him while running away. And importantly, this is after Davis started shooting at him. Yet Davis fired at J.R. nine times in quick succession without ever giving him any warning. And one of the last bullets that he shot fatally struck J.R. I mean, to be fair, he did give him warnings earlier on when he shot him and missed him. Correct. He gave him orders to stop running and get on the ground and I believe show his hands. But he never ordered him to drop the gun and he never said stop running or I'm in the reasonableness of the use of force. And right before he shot and killed J.R., did he say anything in those seconds prior to shooting him? Not immediately before I think the shot that killed him. This took about 10 seconds that he fired those nine shots. And so I think quite clearly on the facts that the district court gave viewed in the light most favorable to the plaintiff, J.R. did not present an immediate threat warranting the use of deadly force. And I think any reasonable officer would have understood that he could not shoot at J.R. as he was running away merely because he was holding a gun. Is it appropriate, Ms. Schnoor, to sort of break this up in the way that you I think are trying to do that is ignoring what happened immediately before J.R. was shot with the sequence of events where the young man is crouched and a gun appears, you say it fell out, the officer says he had it, he brandished it, and that began the fusillade of the officer beginning to fire at the young man. So what are we supposed to make of that evidence? That would suggest that officer appeared or perceived that he might be in danger given the display of a weapon. So I think the question is whether the use of force was objectively reasonable at the moment the deadly force was used. But that is considered in light of the totality of the circumstances, which, of course, as your honor pointed out, includes the incident, the instance where he slips and he the weapon comes out and he picks it up and then keeps running. And I think what's important is that after he gets up, he keeps running and Davis keeps firing at him after it's clear that he is running away. He is not seeking to initiate a gun battle, as officer Davis put it. And so this court has recognized that even if there might be a threat in one moment, that threat can melt away very quickly as the circumstances evolve. And so I would think that whether officer Davis had reason to believe that J.R. posed a threat when he was crouched is, I think, not the question. The question is, a few seconds later, when it's clear that he's running away, he's gaining distance with every second. Does officer Davis have a sound reason to believe that J.R. poses a threat to him then? So Mr. Nichols points out that it's not required that an individual point a gun directly at an officer before the threat is sufficient to warrant the use of deadly force. You agree with that, right? I do agree with that. Yes, your honor. So and then he says that this combination of events, even though the young man was running away from the officer, he was perpendicular to him and turned his head that that and I think that's exactly what Davis says in his statement to SLED that he perceived that the young man was turning his head in order to begin, you know, to pose a threat to the officer and that, in turn, allowed him to use deadly force in that context. I know you disagree with that, but it's supposed to be the perception of the officer, right? Not reality. If he perceived that to be the case, why is that unreasonable? So the question is an objective standard of an officer, a reasonable officer in his position. And so I think there's a question of officer Davis's credibility. That is what he said, that he was in fear for his life. But a jury could look at all the record evidence here. And I think disbelieve that at the moment he shot J.R., he was actually in fear for his life and was not just trying to get J.R. to not be able to get away or just shooting him simply for possessing a gun. And so I think there is a, as the district court recognized, a factual issue here for the jury about what exactly the turn to face Davis was. Was it him seeming to turn around, trying to get a sight and square up against Davis? Or was he simply looking back as he continued running, which is plaintiff's version of events and which the district court acknowledged. And there it's perfectly natural that someone who is being shot at as they're fleeing might look back to see what is happening. It might not necessarily be the prelude to turning around and engaging with him. So the second part of this analysis in qualified immunity is the question of whether even if in fact there was a violation of an individual's rights, whether that right was clearly established. And one of the concerns I have is that the district court in this case kind of framed a right quite broadly. She said that it was the right to not use deadly force absent an immediate threat, which seems kind of general, really general and not specific to the facts of this case. Is there a concern about that? I mean, you're supposed to drill down. Obviously, you don't need a case directly on point, but you need something more than a general principle in order to guide an officer and in order to find liability for an officer. So why is that sufficient in this context? So that's right, Your Honor. I think two points in response to that. First, I think if the court agrees with our understanding of what the facts are as the district court found them, which is that JR may have made no movement that could reasonably be perceived as furtive or threatening here. It is Davis who bears the burden of showing that the right here was not clearly established. And I don't think he has met that burden where the only cases he's relying on, Benton and others, involved an undisputed furtive movement or threatening movement by the individual who was shot. But I think also if reaching the merits, I think the case law here is on point with the requisite amount of specificity. And I think the primary case I would look at is the court's 2017 decision in Hensley, where it also involved an armed individual. And the court said, just because an individual is holding a gun does not mean that deadly force is justified if he hasn't pointed the weapon or otherwise made a threatening movement or a furtive movement. And there, I think if you look at the facts in Hensley, there it's an individual holding a handgun. And there he was on his front porch and the officers witnessed him hit a family member with the gun and then walk down the stairs and walk across his lawn toward the officers. And this court said deadly force was not justified there because he had not made any sort of threatening movement even though he was walking toward the officers. And so I think even more so here where JR has the gun but is running away from Officer Davis, it would, as a matter of logic, follow that deadly force could not be used against him. And I think that would be clear to any reasonable officer. And I think that's particularly clear in light of Garner and it being black letter law that you can't shoot someone just for running away unless they pose a threat. Can I take you back to the sort of the facts, which facts are disputed, which facts are not? Of course, the only other witness to this event is tragically dead, right? It's only the officer who is here available to give his view of the facts. So and you've got a you've got video evidence, but unfortunately, it's not as clear as we would want it to be, at least in the key moments that matter. So I wonder how we can say that an officer's rendition or view of the facts is ambiguous in the face of video evidence that doesn't directly refute his view of the facts. Or maybe you take issue with that. So I would say in this posture, in the interlocutory posture, the court takes the facts as the district court gave them and doesn't have jurisdiction to second guess the court's assessment of the record and whether there's a genuine dispute over the evidence here. I think after there is a final judgment, Officer Davis can raise the question of whether there was sufficient evidence here. But in this posture, I think looking at the facts here, it is J.R. was running away and merely looked back over his shoulder. And on that point, we heard this morning from Davis that he he mentioned again that J.R. was shot in the forehead and that this suggested that he couldn't have been running away at the time he was shot. And he said that also in his reply brief at page 11. And I think on that point, he just doesn't have the evidence necessary to to refute and establish conclusively that J.R. couldn't have been running. So first of all, that's certainly not what the district court said. I think at J.A. 370, it's true that the district court said turn to face. But on the very next page and repeatedly elsewhere through the opinion, the district court is clear that on plaintiff's view of the evidence, the question is whether he was turning his head while running. And the evidence we have in the record, it is that J.R. was shot in the forehead, but not straight through the forehead. It was in the left side of the forehead. And then I think additionally, there is the problem that Officer Davis started shooting at J.R. before it's undisputed that J.R. turned around at all after he started running. So I think I heard a couple different things from Davis this morning. First, I thought I heard him confirm that he's not arguing that Davis could shoot J.R. merely for holding a gun and turning his head. But then I think later on, he seemed to suggest that actually that was what he was arguing and that that was the furtive movement. I think either way, the argument doesn't work. I think if the head turn is the furtive movement, then he has no cases supporting that view. And I think that's very difficult to square with this court's decisions in Franklin and Aleman, where there also were individuals who were armed and who made some movement, but there were factual questions about what exactly that movement was. And this court said a jury could decide that they were shot just because of their possession of the gun. So in Franklin, there's the individual who is being told to drop the gun. He has the gun in his jacket pocket and he reaches in to get it in order to drop it and comply with the orders. But the officer said she perceived him to be pulling out the gun and drawing it in a threatening way. And there was just a factual question there. And so I think, and the court said, if he was being compliant and just drawing the gun in a nonthreatening way, the jury could conclude he was shot just for possessing the gun. And similarly in Aleman, the court said the jury could conclude that he was shot just for possessing the gun, even though he was raising his arms in the position of surrender. And so I think it's very hard to square the outcomes in those cases with an outcome here, where the head turn could somehow be enough to be a furtive movement and that that isn't a question of fact for the jury. And then, of course, to the extent he is arguing that there's something more than the head turn, I think that is adding in facts that the district court found were disputed. And in particular, I think if you look at page 5 of his reply brief, where he recounts what he says are the three court found to be undisputed, he's adding in facts to the third fact about turn to face. He adds in this idea of a crouch, which appears to be sort of subsequent to the initial crouch or slip where the gun comes out. But of course, I just don't see that anywhere in the district court's opinion that it's undisputed that at the moment that officer Davis actually shot J.R. that he was somehow crouched and turning back toward Davis. If J.R. had been shot at the moment that he crouched and pulled the gun out, would we have a different result? I think that's a very different question. And I think there might still be questions for the jury because on plaintiff's version of the facts, he simply slipped. But I think that is a much closer case. That's very different than the question here. And you think it's entirely appropriate to sort of separate separate out these two events? I mean, we've we've done that kind of parsing on in some cases, rejected it in others. What is it about this case that warrants that kind of parsing because it was a threat then? Why isn't he a threat? You know, three seconds later, I think, well, I guess nine or 10 seconds later. And I think because he got back up and started running away and he's you can see in the video he is sprinting, he's trying or a jury could conclude that he's sprinting and he's trying to get away. And again, as this court said, in all on the justification, if there is a threat, it could fall away within a matter of seconds. And so I think this is very similar to that case where just the circumstances evolved. So we're not saying that the totality of the circumstances has to ignore the incident or what happened 10 seconds earlier. But I don't think it's enough to justify the use of deadly force when it happened here. You are in agreement that the question of furtiveness is a question of law, so that we have jurisdiction to review that question. I think that's right, Your Honor, that it would be a but the question of just simply turning one's head back while running viewed in the light most favorable to the plaintiff, whether that could be furtive, I think, would be a question of law. I just don't think it is is furtive. So if there are no questions of law, then we lack jurisdiction. And so my question is really whether we lack jurisdiction altogether, because really, this is a factual dispute, which strikes me hearing your arguments that what's really happening is a dispute of fact as to what happened, kind of trying to be packaged in a legal question so that we can have jurisdiction at this very unusual interlocutory posture. I think that's right, Judge Berner. That's how I understand Davis's argument. It seems to be a question of fact. And whether there could be a question of law, I don't hear him to be I think this court could conclude that it lacks jurisdiction and dismiss the appeal. So to sum up, there are material facts in this case that need to be resolved by a jury. And if the jury credited plaintiff's version of the facts, Officer Davis violated clearly established law by shooting JR as he ran away, merely because he had a gun and not because JR had actually fired Officer Davis or anyone else. So if this court has no further questions, we'd ask that the court dismiss the jurisdictionally barred arguments and otherwise affirm. All right. Thank you very much, Ms. Schnoor. Mr. Nichols? I think you're on mute, sir. Yeah. I turned 68 yesterday. Please forgive me. Thank you very much, Judge Diaz. I would point you to the City of Tahlequah v. Bond case in which held exactly what you said earlier, that the contours must be so well-defined that it be clear to a reasonable officer that his conduct was unlawful in the situation he confronted and you're not supposed to define it broadly. And I would also point out in Elliott v. Leavitt, the court said the use of deadly force, it is not unreasonable for a police officer to use deadly force when the officer has sound reason to believe that the suspect poses a threat of physical harm to the officer or others. Now, I will concede that if the only fact that is undisputed is that JR turned his head, then we lose. I would concede that if the only fact that we have is that JR possessed a firearm, never pointed it, although that's not required, then we lose. But those aren't the only facts. What we have are the, he is running, we can't see from the video on Eau Claire High School or the video, the body cam video, what his position is at that time. So that, I can't say one way or the other whether, I mean, it would be a dispute whether at the point of impact of the round he had stopped. What we do know is that when the deadly force was employed, he had stopped. I'll just tell you that the Eau Claire High School video doesn't show that he slipped. And again, I'm not saying that Judge Lyden made a finding on that, whether he slipped or whether he crawled down. I think the speculation is that he had either the gun in his bag or in his waistband and it but he armed himself during the pursuit. So that's what you have. You have an officer giving him clear instructions to stop, get on the ground, show your hands. You have him arming himself during the, and it's undisputed. You can't look at the video and say, well, Judge Lyden didn't find that. So, I mean, it says what it says and the video is in the record. I know you've seen it and you should, you should look at it again. But he arms himself. Unless there's a case that presented these exact facts where the court found that that there was a reasonable fear or that a reasonable officer would fear, then everything you're talking about are jury questions. Or at a minimum, they're questions of fact, over which we have no jurisdiction at this stage. Judge Berner, they don't have to be exact facts for the officer to be able to acquire qualified immunity for using deadly force during, during an encounter like this. No, but for us to be able to, but for us to be able to conclude as a matter, we're being, we can only review a legal determination. And, and what you're saying is that under these facts, as a matter of law, we must reverse. And these facts that you're describing, this compilation, it's not really a single fact, it's a compilation of fact, because what you're saying now is you're not simply positing that this turn was a furtive movement that, but it's that the turn of the head in combination with the crouch, the pulling out gun, the run, that it's really a series of facts. And so that strays away from this pure question of law as to whether, if it is even a pure question of law, this, this turn of the head could constitute a furtive movement. It really seems to me that you're trying to, as I said to your, your colleague here, that you're trying to repackage a factual dispute as a legal dispute in order to provide us with jurisdiction on appeal. I understand that was characterized that way in the appellee's brief. And I understand that that's how you have characterized it here. I would submit that I have tried to maintain my argument couched in terms of the facts that Judge Leiden found were not in dispute. And what, what I see happening and what I saw Judge Leiden do was not, you have to use those three facts. Those three facts are not disputed facts. They're not for the jury to decide. Those facts, well, at this point, you have to accept the district court finding that those were undisputed facts. If that's not enough, I lose. There's no question, Judge Bern. But we contend the reasonableness of what Officer Davis did that day, knowing that he had a gun. He saw him arm himself during the encounter. And that's when the first shot was fired. He has disobeyed repeated commands to stop, get on the ground, show your hand. We've lost the audio. Yeah, we can't hear you, Mr. Nichols. We may have to just stop right there and see if we can figure out what's going on. You're not on mute. We don't see that. Oh, there you go. You're back. Oh, okay. Sorry about that. I'm not sure I remember my train of thought. Well, you're over time anyway, so you might just want to wrap up. All right. Thank you, Judge Diaz. And I want to thank you for today. And I really appreciate the opportunity to come here and represent Kevin Davis before this court. We would ask that you review this record under the undisputed facts and find that he's entitled to qualified immunity as a matter of law and reverse the district court. Thank you very much. I want to thank both for their arguments here this morning. Really appreciate your help on this very difficult and tragic case. And Ms. Schnooner, in particular, thank you and your law firm for taking this case on pro bono. We are grateful. I know the family of JR is grateful. So thank you both. We come down and greet you, but as you heard earlier, we can't, even technology doesn't allow us to do that. So take care. Thank you, Your Honor.
judges: Albert Diaz, Stephanie D. Thacker, Nicole G. Berner